1

2

3
**UNITED STATES DISTRICT COURT**

4
**DISTRICT OF OREGON**

5
**PORTLAND DIVISION**

6   RANDALL L. JOHNSON,                    )

7                    Plaintiff,            )    No. 03:10-cv-06323-HU
                                           )
8   vs.                                    )
                                           )
9   MICHAEL J. ASTRUE,                     )  **FINDINGS AND RECOMMENDATION**
    Commissioner of Social Security,       )
10                                         )
                     Defendant.            )
11

12                    _____

13  Robert A. Baron
    Kathryn Tassinari
14  Harder, Wells, Baron & Manning, P.C.
    474 Willamette, Suite 200
15  Eugene, OR 97401

16        Attorneys for Plaintiff

17

18  S. Amanda Marshall
    United States Attorney
19  Adrian L. Brown
    Assistant United States Attorney
20  1000 S.W. Third Avenue, Suite 600
    Portland, OR 97204-2904
21

22  David Morado
    Regional Chief Counsel
23  Seattle, Region X
    Nancy A. Mishalanie
24  Special Assistant United States Attorney
    Office of the General Counsel
25  Social Security Administration
    701 5th Avenue, Suite 2900 M/S 221A
26  Seattle, WA 98104-7075

27        Attorneys for Defendant

28

1 - FINDINGS AND RECOMMENDATION

1 HUBEL, United States Magistrate Judge:

2    The plaintiff Randall L. Johnson seeks judicial review
3 pursuant to 42 U.S.C. § 405(g) of the Commissioner's final decision
4 denying his application for Disability Insurance ("DI") benefits
5 under Title II of the Social Security Act, 42 U.S.C. § 1381 *et*
6 *seq.*, and Supplemental Security Income ("SSI") under Title XVI of
7 the Act. Johnson argues the Administrative Law Judge ("ALJ") erred
8 in failing to give clear and convincing reasons for rejecting his
9 testimony and the opinions of his examining and treating
10 psychologists, and failing to meet his step five burden to show
11 Johnson can perform "other work" in the national economy. *See* Dkt.
12 ##15 & 25.

13    The Commissioner has filed a motion to remand the case for
14 further proceedings pursuant to sentence four of 42 U.S.C.
15 § 405(g). Dkt. #19; *see* Dkt. #20, supporting brief. The Commis-
16 sioner "concedes the ALJ erred in his treatment of the opinions of
17 Drs. McConochie and Gizara and in his credibility determination,"
18 and as a result, "the ALJ erred in his residual functional capacity
19 finding, and the subsequent steps in the sequential evaluation."
20 Dkt. #20, p. 5. The Commissioner also concedes the ALJ erred in
21 including an accommodation - "specifically, the wearing of
22 earphones or other devices to reduce noise" - in identifying jobs
23 suitable for Johnson to perform. *Id.* Where the parties disagree
24 is in their positions regarding the appropriate remedy for these
25 errors. Johnson argues substantial evidence in the Record, as it
26 currently exists, supports a conclusion that he is disabled. He
27 requests remand for immediate calculation and award of benefits.
28 *See* Dkt. # 25. The Commissioner argues there are "unresolved

2 - FINDINGS AND RECOMMENDATION

1  issues" in the Record that require remand for further proceedings.
2  *See* Dkt. #20.  I submit the following Findings and Recommendation
3  for disposition of the case pursuant to 28 U.S.C. § 636(b)(1)(B).
4
5                  *I.  PROCEDURAL BACKGROUND*
6      Johnson filed his applications for benefits on November 2,
7  2007, at age thirty, claiming a disability onset date of
8  February 14, 2007.  (A.R. 136-41[1])  His applications were denied
9  initially and on reconsideration.  Johnson requested a hearing, and
10 a hearing was held before an ALJ on February 24, 2010.  (A.R. 23-
11 63)  On March 18, 2010, the ALJ issued an unfavorable decision,
12 discussed in detail below, denying Johnson's claims for benefits.
13 (A.R. 10-18)  Johnson requested review, and on August 3, 2010, the
14 Appeals Council denied his request for review (A.R. 1-3), making
15 the ALJ's decision the final decision of the Commissioner.  *See* 20
16 C.F.R. §§ 404.981, 416.1481.
17
18                  *II.  FACTUAL BACKGROUND*
19                *A.  Summary of the Medical Evidence*
20 *1.  General medical treatment and consultants' opinions*
21     Johnson and his family are Christian Scientists, which
22 explains the paucity of medical evidence in the Record.   On

---

[1]The administrative record was filed electronically using the
court's CM/ECF system.  Dkt. #11 and attachments.  Pages of the
record contain three separate page numbers: two located at the top
of the page, consisting of the CM/ECF number (e.g., Dkt. #11-3,
Page 8 of 64); a Page ID#; and a page number located at the lower
right corner of the page, representing the numbering inserted by
the Agency.  Citations herein to "A.R." refer to the agency
numbering in the lower right corner of each page.

1 February 14, 2007, Johnson was seen in the emergency room for
2 evaluation after he took an overdose of several medications.
3 Johnson had taken approximately twenty tablets, each, of Lisinopril
4 10 mg. (a blood pressure medication), melatonin .3 mg. (a hormone
5 sometimes used to treat insomnia[2]), Benadryl 25 mg, and ibuprofen.
6 Johnson called his parents shortly after taking the drugs.  They
7 came to his apartment and had him drink water containing Epsom
8 salts, which caused Johnson to vomit several times.  In addition,
9 Johnson's roommate called the local poison control center, and
10 Johnson was sent to a hospital for evaluation.  (A.R. 234-35)

11    Johnson stated he was tired, depressed, and without energy.
12 He stated he had had thoughts of self-harm in the past, but had
13 been able to talk himself out of it.  He also gave the following
14 history:

> The patient tells me that he has a condition
> called hyperostosis [sic].[3]  He has a hyper-
> sensitivity to sounds, specifically at high
> frequency. It has been a problem for him ever
> since he was a child for as long as he can
> remember. About a year ago he went to Portland
> and was fitted with his hearing aid, which
> actually decreased the sound level and the
> symptoms. He wears it when he goes to school
> and when he is outside.  He felt better,

---

[2]*See* http://www.rxlist.com/melatonin/supplements.htm (visited Jan. 23, 2012).

[3]This undoubtedly is either a transcription error or a misunderstanding of what Johnson said.  Johnson has been diagnosed with hyperacusis, a hearing disorder.  *See* note 5, *infra*. Hyperostosis, on the other hand, is an excessive growth of bone that is present in many musculoskeletal disorders.  *See* http://en.wikipedia.org/wiki/Hyperostosis (visited Jan. 25, 2012). There is no evidence in the Record that Johnson has ever suffered from hyperostosis.

1          although it did not relieve the symptoms
2          completely.

3  (A.R. 234)

4       Johnson was discharged into his family's care after he signed
5  a safety contract.  He was given referrals for counseling and
6  psychiatric care.  (A.R. 233)  In addition, he was started on
7  trazodone 50 mg. at bedtime.  (A.R. 236)  Although Johnson agreed
8  to follow up with aftercare as recommended, it was many months
9  before he sought further treatment or counseling.

10      On December 4, 2007, Johnson saw Larry Hirons, M.D., a general
11  practitioner, with a complaint of "[h]igh pitched tones and painful
12  sounds in his ears."  (A.R. 274)  Johnson was "pretty much confined
13  to home," unable to leave his room at all on some days because of
14  the ringing in his ears.  (A.R. 275)  Dr. Hirons recommended
15  Johnson see an ear, nose, and throat ("ENT") specialist.  (*Id.*)

16      On December 10, 2007, Johnson was seen by licensed psy-
17  chologist William A. McConochie, Ph.D., of Emotional Education
18  Services, for a psychodiagnostic evaluation at the request of the
19  state agency.  (A.R. 224-28)  Dr. McConochie had no records to
20  review, receiving only a form completed by Johnson for background
21  information.  (A.R. 224)  Johnson described his hypersensitivity to
22  sound, which he stated had "always been present," but particularly
23  during the preceding couple of years.  Dr. McConochie noted the
24  following:

25          Keys, or plates clanging together and other
            high-pitched noises are particularly irrita-
26          ting to him.  He has pains in his ears and
            head as a result.  This interferes with his
27          ability to stay focused.  He has a device that
            creates white noise that he wears, like a
28          hearing aid.  Sometimes he wears headphones.

5 - FINDINGS AND RECOMMENDATION

> The device that makes white noise interferes with conversations unless he removes it. He showed it to the examiner. He removed it during the present evaluation and seemed able to hear the examiner adequately. He said some voices are difficult to hear and that his mother's voice is harsh and hard for him to listen to. He complains that his glasses sometimes give him headaches. He alternates between spectacles and contact lenses.

(A.R. 224-25)

Johnson stated he was verbally abused by his parents as a child. He was a bed-wetter, but eventually grew out of the problem. He made Cs in high school, graduated, and took college courses part time for five years, but never earned a degree. He described past jobs "in video editing, fast food, and web design," and stated he continued to do web design occasionally. He was living at home with his parents. (A.R. 225)

Johnson stated he had been having problems sleeping for eight or ten years. He had frequent crying spells and felt depressed, although he had no current suicidal thoughts. He described problems "keep[ing] his thoughts together," and stated he sometimes was "bombarded with a bunch of sounds," and imagined there were people walking around his house when no one was there. (A.R. 226) He admitted to washing his hands compulsively, which he stated was a life-long habit. (*Id.*)

The doctor did not do any formal I.Q. testing, but based on Johnson's report of his "high school grades, his success at the college level, his interview style and his response to interview questions," he estimated Johnson "to be functioning in the average range with a verbal IQ between 100 and 105." (A.R. 236) Johnson was "able to remember three unrelated words immediately but none of

6 - FINDINGS AND RECOMMENDATION

1  them after several minutes.  However, he was able to recall recent

2  events in his personal life." (*Id.*)  The doctor indicated that

3  except for his hearing problem, Johnson could see and hear without

4  difficulty.  He could read and watch television if he did not have

5  a headache, which he stated he would have two or more times per

6  week.

7       Regarding Johnson's social functioning and daily activities,

8  Dr. McConochie noted the following:

9              He can dress and groom himself and make brief
               telephone calls, but prefers a speaker-phone
10             because he finds a regular phone painful to
               his ear.  He can take a public bus, which he
11             does often.  He doesn't like doing dishes
               because the sound of clanking dishes is irri-
12             tating.  His family uses plastic dishes for
               his convenience.  He finds restaurant noises
13             are frequently too loud.  He can grocery shop
               if he goes in briefly and wears a headphone.
14             He can make simple meals for himself.  He has
               a couple of friends but does not see them
15             regularly, because he gets overwhelmed with
               sounds.  He had to declare bankruptcy a couple
16             of years ago.  During a typical day he may get
               up at eight or 9 a.m. or as early as 3 a.m. if
17             he can't sleep.  He may sleep during the day.
               Sometimes he may sleep for 24 hours.  He likes
18             to go outside when the weather is good.  At
               home he works on the computer, surfing the
19             net.  He may also watch movies.  He can be on
               his feet [and] busy for only about half an
20             hour before he feels tired.  He said he
               usually does a lot of sitting and always has.

21

22  (A.R. 227)

23       Dr. McConochie diagnosed Johnson with "Dysthymic disorder,

24  probable childhood onset." (*Id.*)  He noted Johnson "appears able

25  to handle routine activities of daily living, but appears dependent

26  at the moment on his parents for food, shelter and clothing.  He

27  depends on the state for medical care insurance." (*Id.*)  The

28  doctor opined Johnson would have no limitation in his ability to

7 - FINDINGS AND RECOMMENDATION

1  understand and remember instructions, and moderate impairment in
2  his ability to sustain concentration, attention, and pace, and to
3  engage in appropriate social interactions.  He indicated Johnson's
4  "primary psychological limitation to work activity appears to be
5  depression," and he recommended counseling.    (A.R. 228)    He
6  observed that Johnson's "depression may be to a significant degree
7  secondary to what may be a chronic hearing abnormality." (*Id.*)  He
8  suggested Johnson may need assistance managing money, "given his
9  recent bankruptcy."  (*Id.*)

10      Later the same day (December 10, 2007), Johnson was seen in
11  the emergency room with a complaint noted as "Anger and needs
12  mental health evaluation." (A.R. 230)  Notes indicate Johnson had
13  lost his temper and had begun "hitting his head on the desk."
14  (*Id.*)  Johnson stated he loses his temper "when the sounds over-
15  whelm him," and his loss of temper often "begins with behaviors
16  such as hitting his head." (*Id.*)  He also complained of a slight
17  headache.  Johnson's parents noted that Dr. Hirons had referred
18  Johnson to an ENT specialist; however, Johnson did not have insur-
19  ance or funds to pay for a specialist.  Johnson did not receive any
20  treatment in the emergency room.  He talked with the on-call psy-
21  chiatrist briefly, and was discharged with recommendations that he
22  see an ENT specialist and a psychiatrist for followup. (A.R. 231)

23      On December 13, 2007, Johnson was seen in an otolaryngology
24  clinic for a hearing evaluation.  In addition to describing his
25  hypersensitivity to sound, Johnson stated he sometimes experienced
26  pressure in his ears, "as well as ongoing bilateral pain," and
27  "occasional dizziness." (A.R. 273)  His hearing test was noted to
28

8 - FINDINGS AND RECOMMENDATION

1  be "within normal limits bilaterally." (*Id.*)  He had "type C
2  tympanograms in each ear."[4] (*Id.*)

3      On December 31, 2007, Johnson was seen by George W. Johansen,
4  M.D., an Otolaryngologist, for evaluation of "sensitive ears."
5  (A.R. 271)  Johnson stated his ears rang and buzzed, and prevented
6  him from attending school or completing college.  Dr. Johansen
7  observed that Johnson's audiogram showed "essentially normal
8  hearing . . . and somewhat abnormal tympanograms." (A.R. 272)
9  Johnson stated he had "noise in both ears, somewhat more in the
10 left ear," with "more pressure in the right ear, with blockage of
11 his right ear." (*Id.*)  He also described "an anger problem, [and]
12 emotional problems[.]" (*Id.*) Johnson's tympanic membranes were
13 examined with a microscope.  His right tympanic membrane was noted
14 to be "definitely dull," and his left "slightly dull." (*Id.*)  He
15 had slight swelling of both vocal cords.  He was diagnosed with
16 "Serous otitis media, tinnitus and hyperacusis.[5]" (*Id.*)  The
17 doctor prescribed a trial of Nasonex.  He noted Johnson seemed to
18 benefit from use of his "masking devices." (*Id.*)  The doctor
19 recommended Johnson eliminate salt and coffee from his diet. (*Id.*)
20 / / /
21 / / /

22 ────────────────────

23     [4]"A tympanogram provides information regarding the compliance
   of the middle ear system (how well sound passes through the eardrum
24 to the middle ear system), ear canal volume, and middle ear
   pressure. . . .  Type C tympanograms . . . indicate[] negative
25 pressure in the middle ear space, often consistent with sinus or
   allergy congestion, or the end-stages of a cold or ear infection."
26 http://www.audiologyonline.com/ (visited Jan. 24, 2012).

27     [5]"Hyperacusis may be defined as a reduction of normal toler-
   ance for everyday sounds."  http://www.hyperacusis.org/ (visited
28 Jan. 23, 2012).

9 - FINDINGS AND RECOMMENDATION

1    On January 8, 2008, Johnson saw Dewayde C. Perry, M.D.[6] for a
2  consultative examination.  (A.R. 239-42)  Johnson stated he had
3  been diagnosed with hyperacusis two years earlier.  He described
4  his symptoms, stating he "will hear sounds in the distance, which
5  will distract him from paying attention.  This causes headaches and
6  difficulty sleeping."  (A.R. 239)  He stated he spends most of his
7  time in his bedroom, where there is less noise, and he wears
8  headphones in public to block intense sounds.  (*Id.*)  During his
9  physical examination, Johnson wore a "skullcap" and headphones,
10 held his head down, and made little significant or prolonged eye
11 contact.  Other than his hearing problem, he exhibited no physical
12 problems on examination.  Dr. Perry made the following assessment:

13          The number of hours the claimant could be
             expected to stand and walk in an eight-hour
14           workday is not restricted.

15          The number of hours the claimant would be able
             to sit in an eight-hour workday is not
16           restricted.

17          There are no assistive devices.

18          The amount of weight the claimant could lift
             or carry is without restriction.
19
20          There are no postural limitations on bending,
             stooping and crouching.

21          There are no manipulative limitations.

22          There are significant hearing and communica-
             tive limitations, secondary to the claimant's
23           hyperacusis.  The claimant generally needs to
             wear headphones to dampen and reduce noises
24

25

26      [6]Dr. Perry's website indicates he was "[t]rained as a general
     surgeon," and now "has merged his medical expertise and passion for
27   fitness and nutrition to create Center for Integrative Health and
     Performance."    http://www.centerforihap.com/index.html  (visited
28   Jan. 23, 2012).

10 - FINDINGS AND RECOMMENDATION

1        and sometimes he wears earplugs for the same
2        reason.

3  (A.R. 242)

4       On January 23, 2008, psychologist Frank Lahman, Ph.D. reviewed
5  the record and completed a Psychiatric Review Technique.  (A.R.
6  243-55)  He found Johnson to have a dysthymic disorder, with mild
7  limitations in his activities of daily living; concentration,
8  persistence, or pace; and social interactions.  He noted it is
9  Johnson's hyperacusis that is functionally limiting him; "his
10 dysthymic disorder does not severely limit function."  (A.R. 255)

11      Also on January 23, 2008, J. Scott Pritchard, D.O., a
12 specialist in Internal Medicine, reviewed the record and completed
13 a Physical Residual Functional Capacity Assessment of Johnson.
14 (A.R. 257-64)  Dr. Pritchard opined Johnson would have no exer-
15 tional, communicative, or environmental limitations of any kind.
16 He noted that although Johnson "has a reported history of
17 hyperacusis," there was "no current evidence in [the Record] to
18 fully substantiate this impairment."  (A.R. 264)  Nevertheless, he
19 gave substantial weight to Dr. Perry's finding that Johnson "needs
20 to wear headphones to dampen and reduce noises and sometimes he
21 wears earplugs."  (A.R. 263, 264)

22      Johnson saw Dr. Johansen for followup on January 29, 2008.
23 Johnson had "a definite fluid level present" in his right ear.  His
24 right tympanic membrane was "somewhat thickened," while the left
25 was "somewhat dull."  (A.R. 270)  A tympanogram showed "decreased
26 curves."  (*Id.*)  The doctor cleared Johnson's ears with insuffla-
27 tion, and prescribed a course of amoxicillin and continued Nasonex.
28 He noted Johnson might be a candidate for eustachian tubes.  (*Id.*)

1    Johnson saw Dr. Johansen on February 29, 2008, for followup.
2  His right tympanic membrane was "somewhat dull," but the fluid
3  level was gone.  His left tympanic membrane was slightly hardened.
4  The doctor noted Johnson was "going to remain on Archer vitamins,"
5  which had "helped him somewhat."  (A.R. 268)  He advised Johnson
6  that he might benefit from a eustachian tube on the right, although
7  Johnson's major problem seemed to be the hyperacusis.  (*Id.*)
8  Johnson saw Dr. Johansen again on April 4, 2008, but the narrative
9  portion of the progress notes is missing from the Record.  (*See*
10 A.R. 266)

11   Dr. Johansen saw Johnson for followup on May 16, 2008.
12 Johnson complained of "blockage of both ears and constant noise[.]"
13 (A.R. 296)  He had been "wearing his devices," which "seemed to
14 help his tinnitus."  (*Id.*)  Johnson had joined a support group at
15 the doctor's urging.  Upon examination, Johnson's left tympanic
16 membrane was "slightly retracted," while the right was "thickened
17 and dull."  (A.R. 297)  He was treated with insufflation, which
18 "definitely seemed to improve as far as the ear blockage."  (*Id.*)

19   Johnson saw Dr. Johansen on June 27, 2008, complaining of
20 blockage and fullness in both ears, worse on the right.  He stated
21 Nasonex and insufflation had helped somewhat.  His ears were
22 cleared with insufflation, and continued Nasonex was prescribed.
23 (A.R. 294-95)

24   Johnson returned to see Dr. Johansen on July 31, 2008,
25 complaining of "blockage of his right ear associated with noise
26 bilaterally," with an intermittent feeling like he had water in his
27 right ear.  (A.R. 292)  He stated Nasonex and the insufflation
28 treatments had helped keep his ears more open.  He reported

1  exercising more and attempting to lose weight, and he had a paper
2  route.   Upon examination, Johnson's right tympanic membrane was
3  thickened with fluid present.    The left tympanic membrane was
4  "slightly dull."  (A.R. 293)  His tympanogram showed "decreased
5  curves bilaterally." (*Id.*)  He was diagnosed with "[c]hronic otitis
6  media, serous otitis media, and tinnitus."  (*Id.*)  His ears were
7  cleared and continued Nasonex was prescribed.  (*Id.*)

8      On October 10, 2008, clinical psychologist Joshua J. Boyd,
9  Psy.D. reviewed the record and concurred with Dr. Lahman's January
10 2008 conclusion that, from a mental health standpoint, Johnson's
11 dysthymic disorder was non-severe.  (A.R. 298)  Dr. Boyd noted
12 Johnson "alleges hyperacusis and states that is what limits him.
13 However, this diagnosis has not been substantiated with the
14 available evidence in file."  (*Id.*)

15     On October 14, 2008, physical medicine and rehabilitation
16 specialist Linda L. Jensen, M.D. reviewed the record and found "no
17 significant loss of function from a physical standpoint."  (A.R.
18 299)  She concurred in the prior evaluators' conclusions that
19 Johnson has no physical functional limitations.  Dr. Jensen noted
20 Dr. Pritchard's initial residual functional capacity assessment
21 "allowed for [Johnson's] obesity, [hypertension,] and the
22 hyperacusis even though that was not an established impairment."
23 (*Id.*)

24

25 **2.   Mental health treatment**

26     On July 24, 2008, Johnson was seen by a mental health social
27 worker at Direction Service Counseling Center for a psychosocial
28 assessment and intake evaluation.   Johnson reported feeling

13 - FINDINGS AND RECOMMENDATION

1  overwhelmed by his sensitivity to sound, often retreating to his
2  bedroom "to shut out the world." (A.R. 277)  He stated he had been
3  unable to work with others in an office environment, and could not
4  withstand a classroom environment, due to overstimulation of his
5  auditory system. (*Id*.)  When he tried to go back to school to get
6  a degree in computer programming, he was unable to focus in class,
7  and therefore he could not learn what he needed.  "It became so
8  stressful he could not sleep." (A.R. 279)  Johnson stated he had
9  to quit his job in video production because his colleagues and boss
10 would not attempt to accommodate his hyperacusis, becoming "quite
11 frustrated" with him. (*Id*.)  The evaluator noted the following:

> [Johnson] meets criteria for Dysthymic
> Disorder given his endorsement of multiple
> symptoms of depression (e.g., increased
> appetite, difficulties sleeping, feelings of
> worthlessness, low energy) that have not been
> absent for a period of 2 months during the
> past 10 years or so. [He] endorsed a number
> of symptoms of anxiety (e.g., tension,
> fatigue, aches/pains, irritability) that
> appear to be better accounted for by his
> experience with hyperacusis. It may be impor-
> tant to note that many of [his] symptoms are
> congruent with *some* aspects of Autism spectrum
> disorders (e.g., Asperger's Disorder) but he
> does not appear to meet criteria.

20 (A.R. 280)

21     Beginning immediately after his evaluation, Johnson began
22 seeing psychologist Sharon Smith Gizara, Ph.D. for individual
23 counseling sessions. (*See* A.R. 300-54)  Dr. Gizara saw Johnson
24 approximately every two weeks from July 24, 2008, through
25 January 22, 2009. Johnson stopped his counseling sessions when his
26 Oregon Health Plan coverage was discontinued.  He resumed
27 counseling in June 2009, "at a significantly reduced sliding fee
28 basis," (A.R. 353), seeing Dr. Gizara twelve more times in 2009,

14 - FINDINGS AND RECOMMENDATION

1  and twice in 2010, before the end of the records submitted to the

2  ALJ for review.  (A.R. 300-54)

3       On January 11, 2010, Johnson's attorney asked Dr. Gizara to

4  review the Psychiatric Review Technique completed by Dr. Lahman on

5  January 23, 2008; Dr. Boyd's notes dated October 10, 2008; and

6  Dr. McConochie's report from his consultative examination of

7  December 10, 2007. (A.R. 348)  In a report dated February 16, 2010,

8  Dr. Gizara discussed her treatment of Johnson, and offered her

9  opinion regarding his mental functional abilities, stating as

10  follows:

> The nature of the treatment that I have
> provided for Mr. Johnson is adult individual
> psychotherapy, primarily using Cognitive-
> Behavioral Therapy, which is an evidence-based
> practice for depression and anxiety.  I also
> regularly work from pain management treatment
> protocols with this client.  My working con-
> ceptualization is of a person who has experi-
> enced a long-term medical condition which
> significantly impacted his ability to function
> normally, and which secondarily resulted in
> depression and anxiety.  Mr. Johnson has been
> quite cooperative and motivated in treatment.
> He reports and demonstrates good progress in
> applying more productive self-awareness and
> coping strategies.  His current baseline
> levels of both anxiety and depression are
> significantly reduced from the time that he
> started treatment.

> Mr. Johnson's DSM IV diagnosis is as follows:

> Axis I:   Dysthymic Disorder, Early Onset
> (300.4) [and] Generalized Anxiety Disorder
> (300.00)
> Axis II:  No diagnosis (v71.09)
> Axis III: Hyperacusis, high blood pressure,
> obesity
> Axis IV:  Economic difficulties, social isola-
> tion
> Axis V:   [GAF estimate] 65

> I would also like to note, that during the
> time that Mr. Johnson has been my client, I

have never had concerns about drug or alcohol problems.

I believe that Mr. Johnson's hearing abnormalities have a profound negative impact on his ability to function on a day-to-day basis. Even with the steady progress he has made with reducing his anxiety and depression, Mr. Johnson appears to need to be exceptionally careful when he is functioning outside of highly controlled environments where there is limited exposure to sensory stimulation. He has never appeared in my agency or office without wearing his sound-generating devices over his ears. We schedule appointments at 9:00 am, in part to accommodate his need to avoid a busy (and noisy) waiting room. Although Mr. Johnson has consistently presented as courteous and friendly throughout our sessions, he can quickly become distracted, overwhelmed, and irritable by even minor sources of noise in the environment. These reactions appear to be physically painful for Mr. Johnson, and appear to contribute to his anticipatory anxiety when he is faced with the need to interact with less predictable environments/people.

Even with further improvements in his ability to manage anxiety and depression, I find it difficult to imagine Mr. Johnson being able to function successfully in a work setting. I believe that he would deteriorate rapidly if required to interact with the public, or interact with supervisors or co-workers, even on a limited basis. Because managing his physical condition requires so much minute-to-minute self-monitoring and coping, I believe that responding to changing tasks/directions from a supervisor would be beyond Mr. Johnson's ability. Any job in which I can imagine Mr. Johnson functioning successfully would require <u>significant</u> environmental accommodations, and a high level of scheduling flexibility. Beyond the scope of a few hours of work daily, I do not believe that Mr. Johnson could maintain regular employment without excessive absences or poor performance concerns.

(A.R. 353-54; emphasis in original)

/ / /

/ / /

16 - FINDINGS AND RECOMMENDATION

### B.  Medical Expert's Testimony

Arthur Harold Briggs, M.D. testified as a Medical Expert ("ME") at the ALJ hearing.  He graduated from medical school in 1956, and lists his primary specialty as Clinical Pharmacology and his secondary specialty as Internal Medicine. (A.R. 129)  Dr. Briggs noted that the regulatory Listings do not contemplate the type of problem Johnson has; i.e., his "hyperacusis which means it's a hyper sensitivity to sound." (A.R. 32-33)  Besides Johnson's hearing problem, and the fact that Johnson is overweight, the doctor could identify no physical limitations on Johnson's ability to work. (A.R. 33)  Dr. Briggs agreed with Dr. Perry's assessment that it would seem medically necessary for Johnson to wear headphones to reduce sounds in his environment. (A.R. 34)  He also agreed that Johnson "should be working in a quiet environment." (A.R. 35)

Dr. Briggs found no reason to question that Johnson actually has hyperacusis, and he found Johnson to be credible with regard to his reporting of his problems to medical providers. (*Id.*)  He also noted the possibility that Johnson's hearing problems "might affect him emotionally or might be related to headaches." (*Id.*)

### C.  Vocational Expert's Testimony

The Vocational Expert ("VE") indicated Johnson had worked at the substantial gainful activity level in 1999 and 2000, as a Video Transferrer, a light, skilled job.  In 2004 and 2005, Johnson made "close to $10,000 and $9,000 for Cinemark as a Projectionist," a medium, semi-skilled job. (A.R. 54)

/ / /

17 - FINDINGS AND RECOMMENDATION

1    The ALJ asked the VE to consider a hypothetical individual of
2    Johnson's age and with his education and work experience, with no
3    exertional limitations, but the need for "a job where he can wear
4    his earphones or a similar hearing assistive device.  He needs to
5    be in a reduced noise environment where a work environment is
6    relatively clean with low levels of . . . noise.  He needs only
7    occasional  interaction  during  the  day  with  supervisors  and
8    coworkers."  (A.R. 55)  The VE stated this individual could not
9    perform any of Johnson's past jobs.  However, the VE stated "more
10   than half of the jobs that exist in the [Dictionary of Occupational
11   Titles] don't require hearing . . . as a vital part of the job."
12   (A.R. 55-56)  He gave examples of Industrial Cleaner, which he
13   stated "is pretty isolated [and] doesn't require hearing or talking
14   under  the  Characteristics  of  Occupations  and  that  is . . . a
15   medium, unskilled [job]."  (A.R. 56)  He gave additional examples
16   of an Automobile Detailer, a medium, unskilled job; and a Restroom
17   Attendant, a light, unskilled job.  (*Id.*)  The VE stated all three
18   of  these  jobs  could  be  performed  even  with  the  additional
19   limitation  of  the  need  to  "avoid  unprotected  heights,  moving
20   machinery, or vibrations."  (A.R. 56-57)

21   The VE noted that if an individual could not manage even the
22   type of incidental noise that might get through his headphones, and
23   if that affected the individual's attendance at work, then it would
24   impact his ability to keep the types of jobs identified.  (A.R. 59)
25   Similarly, if the individual had headaches that required him to
26   isolate himself over and above the regular number of allowed
27   breaks, "[t]hat would be too much time off."  (A.R. 60)  Also, if
28

18 - FINDINGS AND RECOMMENDATION

1 a person would be unable to interact with supervisors, he would be
2 unable to work.  (A.R. 61-62)

3      The VE stated that being allowed to wear a "head device" would
4 fit within "the reasonable accommodation rules."   (A.R. 62)
5 However, an individual would have to be able to remove the headset
6 to talk with supervisors, and then put it back on.  Otherwise, he
7 could not hold a job successfully.  (*Id.*)

### D.   Johnson's Testimony

**1.   Hearing testimony**

11      At the time of the hearing, Johnson was thirty-two years old.
12 He is 5'8" tall, and weighs 240 to 245 pounds.  He is single, and
13 lives with his parents, but he buys his own food.  He was in
14 regular classes during high school.  He took college courses for
15 four or five years, but never earned a degree.  He can read and
16 write, and he is right-handed.  (A.R. 27-28, 31, 37)

17      Johnson has a paper route.  Unless it is raining, he rides a
18 bike to deliver the papers, but he has to drive in bad weather and
19 on Sundays.  He earns around $600 a month from the paper route,
20 depending on how much he receives in tips.  Johnson also does
21 sporadic website monitoring for a client.  (A.R. 28-29)  During
22 2008, Johnson earned $5,004, spread throughout the year.  (A.R. 29)
23 He had not yet done his taxes for 2009, but he estimated his income
24 would be about the same as it was in 2008.  (A.R. 30)  He did a
25 part-time work-study job in a community college library for awhile,
26 putting away books, but he still had problems with the sounds in
27 the library.  (A.R. 45)

28 / / /

19 - FINDINGS AND RECOMMENDATION

Johnson worked in video editing, but he quit the job because "the high pitched whines coming off the monitors and TV sets" bothered him.  (A.R. 46)  He told his coworkers but, according to Johnson, no one else could hear the noise, and they did not believe him.  In addition, sometimes his boss would stand next to him while jingling keys or coins in his pocket, and the sound bothered Johnson.  He often would go into the bathroom and hit his head to deal with the headaches.  (*Id.*)  He still hits his head once a month or so, and then he isolates himself in his room for as long as a day. (A.R. 47)

The only medications Johnson was taking at the time of the hearing were over-the-counter pain medications for headaches; he was taking no prescription medications for his mental health problems.  He stated his counselor was trying to help him resolve his mental health problems with medications.  (A.R. 36)  He does not have insurance, so his parents help him pay for his counseling sessions.  He has migraine headaches almost every day, several times a day.  His headaches vary in intensity, often being very severe.  He has not seen a neurologist and is not taking prescription medications for his headaches.  (A.R. 39-40, 41)  His headaches sometimes are so severe, he cannot handle talking to anyone and he has to lie down, or he might take a shower to have water rushing over his head.  (A.R. 42-43)  He estimated he takes a long shower to deal with headaches three or four times a week. (A.R. 43)  If he has a headache during his paper route, he has to stop, close his eyes, and "just breathe."  (A.R. 44)  A couple of times a month, he actually has to return home to rest for 15 to 45 minutes before he can complete his paper route.  (*Id.*)

20 - FINDINGS AND RECOMMENDATION

Johnson did not begin using his white-noise device until 2005 or 2006.  He stated his hyperacusis was diagnosed by "Dr. Marsha Johnson up in Portland."  (A.R. 37)   To his recollection, Dr. Johnson was a Ph.D. with "some training in audiology. . . . Things like that."  (A.R. 38)

Johnson spends most of his time alone in his room.  He has a couple of friends in town, but he rarely leaves his home to socialize or visit with other people.  He sees his grandmother occasionally.  He chats with people via e-mail.  He also communicates with his mother by e-mail, even though they live in the same household.  They do not speak often because her voice hurts his ears.  (A.R. 38-39)

Johnson stated the noise in the waiting area outside of the hearing room was "distracting."  (A.R. 40)   He wears sound generators in his ears that produce "a ground noise."[7]  (A.R. 40) He stated the noise generated by the device helps "take some of the edge off" of his tinnitus, and helps him drown out the sounds around him.  (*Id.*)   He noted that he had not heard much of Dr. Briggs's testimony because the noise of papers shuffling was making his ears hurt, so he turned the volume up on his sound generator.  (A.R. 40-41)  He has trouble driving because he cannot wear his headphones while he drives, and the high-pitched sounds of his own car and other cars on the roadway bother him.   To

---

[7]The hearing transcript refers frequently to "Brown Noise," but here refers to "ground noise."  It is not clear whether the transcriptionist misunderstood what Johnson said, or if he actually used both of these terms.  In any event, it is clear he is referring to a type of "white noise" generated by the device he wears that blocks out certain types of sounds.

21 - FINDINGS AND RECOMMENDATION

compensate, he tunes his radio to static to dry to drown out the sounds. (A.R. 41)  When he has to go out in public, he wears his headphones to drown out sounds, but for the most part, he avoids going out in public because it "can be overwhelming" for him. (A.R. 48)  He does his own shopping, but goes in the morning when there is little traffic.  About half the time, he leaves the store before finishing the shopping he needs to do.  (*Id.*)

When Johnson is around a lot of sounds, he has problems focusing and concentrating.  He stated he has "never been able to tune out sounds." (A.R. 49)  He has a high-pitched ringing sound in his ears all the time.  His sound generators take the edge off of the ringing.  (*Id.*)  If he has to work in a job where he cannot wear his headphones, he feels overwhelmed, "and the pain can make it hard to be able to focus[.]" (A.R. 50)  He finds it difficult to be in a work situation where there are sounds, especially high-pitched sounds, that he cannot control.  He stated, "It's distracting.  It causes pain in my ears.  It gives me headaches a lot of times." (A.R. 51)  It makes him upset and angry.  (*Id.*)

**2.  *Written testimony***

In a Disability Report completed in conjunction with Johnson's applications, he described his impairments as "[s]uicide attempt, super hyperacusis, depression, high blood pressure, and obesity." (A.R. 170)  He indicated that "[s]ounds" limit his ability to work, stating, "Everywhere I go the sounds are louder - it feels like I am in a fishbowl.  Every sound is amplified.  This has triggered my depression.  It is so hard to leave my home.  I am just overwhelmed." (*Id.*)

22 - FINDINGS AND RECOMMENDATION

1    Johnson described his past work in video production as "[f]ilm
2  maker and transfer," noting, "Before people could do this
3  themselves, I transfer[r]ed old super 8 tapes and put it to video
4  (this was before CDs). I also filmed events and edited that film."
5  (A.R. 171)

6    Johnson completed a Function Report on December 1, 2007. He
7  described his daily activities as follows:

8           Once I am fully awake I take a shower and eat
            something. Depending on how I'm feeling and
9           my tolerance for sounds, I may go outside or
            to the library. I take and wear my headphones
10          if I do. If I am at home I mostly stay in my
            room so I can regulate sounds better. I'll
11          work on my computer or watch a movie. When it
            is warm out I'll go for a walk or ride my bike
12          for exercise if I am able to. A lot of times
            if my ears or head hurt I'll stay home.
13

14  (A.R. 177) Johnson stated he has problems falling asleep, and has
15  "a hard time keeping a regular sleep schedule." (A.R. 178) He
16  indicated he can do laundry, cleaning, and prepare simple meals.
17  He only drives occasionally because he is bothered by the car noise
18  and street noise. He prefers to walk or take a bus because he can
19  wear his headphones to drown out the sounds. He does his own
20  shopping for his personal needs, computer accessories, and the
21  like, but he wears headphones in the stores and only stays as long
22  as necessary. He stated, "I am having a hard time working because
23  of my difficulty with sounds. The money I do make from work I can
24  do at home isn't enough to cover my expenses." (A.R. 180) He
25  avoids using change because the sound of coins bothers him, so he
26  tends to use a debit card more than cash. He enjoys listening to
27  soothing music, surfing the Internet, and watching movies,
28  depending on how he is feeling each day. He communicates with

23 - FINDINGS AND RECOMMENDATION

1  friends and family via e-mail because he has "a hard time with some
2  kinds of voices so [he] keep[s] personal interaction at a minimum."
3  (A.R. 181)   He goes to the library once or twice a week, always
4  wearing his headphones to block out any sounds.   (*Id.*)

5       Regarding his ability to get along with people, Johnson
6  stated, "I have a hard time with certain sounds and voices.  When
7  someone is making those sounds around me or talking with a voice
8  that is harsh to my ears[,] I'm on edge and uncomfortable, and it
9  can be painful. . . .   Sounds, like high-pitched sounds, dishes,
10 keys, coins, voices with hard "t," "s" sounds, for example, cause
11 me to experience pain in my ears and head which affects my ability
12 to [talk, hear, understand, concentrate, follow instructions, and
13 complete tasks]."   (A.R. 182)   Johnson indicated he has a low
14 tolerance for stress, which makes him feel sick.  His condition
15 causes him "to eat more and have a fear of leaving the house,"
16 because he cannot anticipate all the sounds he might have to deal
17 with.   To deal with his condition, he uses "sound generators" to
18 mask his "high-pitched tinnitus." According to Johnson, his sound
19 generators were prescribed by "a specialist" about a year-and-a-
20 half prior to his application for disability benefits.   He also
21 wears glasses that he indicated were prescribed by a doctor. (A.R.
22 183)

23      In the Remarks section of the form, Johnson wrote the
24 following:

25          I had to quit a job because of my difficulty
            with sounds in the work place.  When I did
26          speak up about my problem my employer reacted
            negatively towards me.
27
            I was diagnosed with tinnitus and hyperacusis.
28          Because of these conditions I have a dif-

24 - FINDINGS AND RECOMMENDATION

1
2
> ficulty with sound and have loud high-pitched
> tones that I hear all the time in my ears.  I
> have a very hard time dealing with that.

3
4
5
> I wear sound generators that help to mask some
> of the tinnitus, but make it hard to converse
> with others.  They produce a white noise like
> sound that is broadcast into my ears.

6
> I wear headphones a lot to block out sounds.

7  (A.R. 184)

8       On a Disability Report prepared at the time Johnson appealed

9  the denial of his applications for benefits, Johnson indicated, "I

10 have less tolerance for the pain I feel in my ears and head.  This

11 has made it harder for me to concentrate on anything that is

12 difficult and complex.  I spend a lot of time at home trying to

13 cope with my pain."  (A.R. 200)  He indicated he had been seeing an

14 ENT doctor who "found an imbalance of pressure between both [of

15 his] ears."  (*Id.*)  He stated his right ear feels more plugged up

16 than his left, and he also tends to have "excess fluid build up in

17 [his] ears."  (*Id.*)  Johnson listed his current medications and the

18 reasons he was taking them as follows: Claritin, "Helps to reduce

19 the severity of my allergies I get in the Spring and Summertime

20 because of pollen and cut grass etc."; Diphenhydramine

21 Hydrochloride, "To help reduce my difficulty with falling asleep";

22 Melatonin with Theanine, "For stress relief and to help give me a

23 sounder sleep"; Tinnitus B12 Formula, prescribed by Dr. Johansen,

24 "to help reduce the severity of Tinnitus"; and Tylenol Extra

25 Strength, "To help relieve some of the severity of the pain I feel

26 in my head."  (A.R. 203)  He indicated the Diphenhydramine

27 Hydrochloride and the Melatonin both leave him feeling "foggy in

28 the head the following day."  (*Id.*)

25 - FINDINGS AND RECOMMENDATION

1    Johnson stated his tolerance for being around others also was

2    lower, noting he was "more insistent that people do not make sounds

3    that cause additional pain in [his] ears and head when they are

4    around [him]." (A.R. 204) He stated sounds that are painful to

5    him are considered "normal" by others, and many interactions and

6    locations involve "many of those 'normal' sounds," making it

7    difficult for him to find any type of job he can do. (*Id.*) He

8    stated, "It is difficult to work when you are dealing with pain in

9    your ears and head. I've only been able to manage some part time

10   work and so have had to live with my parents which has been a

11   burden to them." (*Id.*) In his closing remarks, Johnson stated as

12   follows:

13            Dr. G. Wallace Johansen said that my Hyper-
             acusis is hard to treat. Most people don't
14           understand what it is I suffer from on a daily
             basis, so I have the following definition for
15           you: "Hyperacusis is a health condition
             characterized by an over-sensitivity to
16           certain frequency ranges of sound (a collapsed
             tolerance to normal environmental sounds)."
17           "A person with severe hyperacusis has
             difficulty tolerating everyday sounds, some of
18           which may seem unpleasantly loud to that
             person but not to others." (From:
19           en.wikipedia.org/wiki/Hyperacusis) Because of
             my Hyperacusis I suffer from a lot of pain,
20           anxiety, stress and phonophobia. When I was
             younger I wet the bed beyond what was con-
21           sidered normal. My parents tried a program
             that used a bell next to my ear to wake me up
22           whenever I wet. It was this event that
             probably triggered my Hyperacusis according to
23           Dr. Marsha Johnson from the OTHTC. Since then
             I have had a painful sensitivity to sound.
24           Because of my mother's religious beliefs I was
             never allowed to be taken to see a doctor. So
25           I never received any medical treatment for my
             ears. As I've gotten older my Hyperacusis has
26           gotten worse. I've tried to live each day
             dealing with it, but don't have the tolerance
27           for it anymore. In the last couple of years I
             have also had an onset of severe tinnitus. I
28           hear a loud high-pitched tone in my ears all

1    day every day, on top of the normal tinnitus
     most people hear. It drives me nuts and makes
2    it very hard for me to concentrate and fall
     asleep. I also have difficulty with different
3    kinds of movements, like people[']s feet,
     people chewing with there [sic] mouths open or
4    chewing gum. It makes me extremely uncom-
     fortable. I've learned that people who suffer
5    from Hyperacusis also suffer from these types
     of eye irritants. What I am looking for is
6    some assistance to help take some of the
     financial burden off of my parents, because of
7    my living with them because of my health
     condition.

8

9    (A.R. 206)

10

11              *E.  Third-Party Testimony*

12       Kathryn Johnson, Johnson's mother, completed a third-party

13   Function Report on November 3, 2007. (A.R. 158-65) She stated

14   Johnson spends most of his time in his room due to his inability to

15   tolerate sound. She goes grocery shopping with him for about ten

16   minutes every couple of weeks, and he wears sound-masking head-

17   phones most of the time when she sees him. She stated that in the

18   past, Johnson was able to interact with people, talk with family

19   and friends, attend school, live in his own apartment with

20   roommates, and go to movies, but he is no longer able to do any of

21   these things. According to Mrs. Johnson, her son has problems

22   falling asleep and staying asleep. She indicated Johnson is able

23   to handle his own personal care, handle money, and do all types of

24   household chores. She noted the family uses plastic plates because

25   of Johnson's "sound issues." (A.R. 160) According to her,

26   although Johnson can do his own shopping, he does not shop for long

27   because "the headphones get tiring for him to listen to." (A.R.

28   161) She stated Johnson is unable to think clearly when he is

27 - FINDINGS AND RECOMMENDATION

1  around sounds, and sounds make his head hurt.  He does better with

2  written instructions than with spoken ones because the sounds

3  people make when speaking bother him.  (A.R. 163)

4

5      **III.  *DISABILITY DETERMINATION AND THE BURDEN OF PROOF***

6                    **A.  *Legal Standards***

7      A claimant is disabled if he or she is unable to "engage in

8  any substantial gainful activity by reason of any medically

9  determinable physical or mental impairment which . . . has lasted

10 or can be expected to last for a continuous period of not less than

11 12 months[.]"  42 U.S.C. § 423(d)(1)(A).

12     "Social Security Regulations set out a five-step sequential

13 process for determining whether an applicant is disabled within the

14 meaning of the Social Security Act." *Keyser v. Commissioner*, 648

15 F.3d 721, 724 (9th Cir. 2011) (citing 20 C.F.R. § 404.1520).  The

16 Keyser court described the five steps in the process as follows:

17          (1) Is the claimant presently working in a
            substantially gainful activity?  (2) Is the
18          claimant's impairment severe?  (3) Does the
            impairment meet or equal one of a list of
19          specific impairments described in the regula-
            tions?  (4) Is the claimant able to perform
20          any work that he or she has done in the past?
            and (5) Are there significant numbers of jobs
21          in the national economy that the claimant can
            perform?
22

23 *Keyser*, 648 F.3d at 724-25 (citing *Tackett v. Apfel*, 180 F.3d 1094,

24 1098-99 (9th Cir. 1999)); *see Bustamante v. Massanari*, 262 F.3d

25 949, 953-54 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1520 (b)-(f)

26 and 416.920 (b)-(f)).  The claimant bears the burden of proof for

27 the first four steps in the process.  If the claimant fails to meet

28 the burden at any of those four steps, then the claimant is not

28 - FINDINGS AND RECOMMENDATION

1 disabled. *Bustamante*, 262 F.3d at 953-54; *see Bowen v. Yuckert*,
2 482 U.S. 137, 140-41, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119
3 (1987); 20 C.F.R. §§ 404.1520(g) and 416.920(g) (setting forth
4 general standards for evaluating disability), 404.1566 and 416.966
5 (describing "work which exists in the national economy"), and
6 416.960(c) (discussing how a claimant's vocational background
7 figures into the disability determination).

8     The Commissioner bears the burden of proof at step five of the
9 process, where the Commissioner must show the claimant can perform
10 other work that exists in significant numbers in the national
11 economy, "taking into consideration the claimant's residual
12 functional capacity, age, education, and word experience." *Tackett*
13 *v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner
14 fails meet this burden, then the claimant is disabled, but if the
15 Commissioner proves the claimant is able to perform other work
16 which exists in the national economy, then the claimant is not
17 disabled. *Bustamante*, 262 F.3d at 954 (citing 20 C.F.R.
18 §§ 404.1520(f), 416.920(f); *Tackett*, 180 F.3d at 1098-99).

19     The ALJ determines the credibility of the medical testimony
20 and also resolves any conflicts in the evidence. *Batson v. Comm'r*
21 *of Soc. Sec. Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) (citing
22 *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)).
23 Ordinarily, the ALJ must give greater weight to the opinions of
24 treating physicians, but the ALJ may disregard treating physicians'
25 opinions where they are "conclusory, brief, and unsupported by the
26 record as a whole, . . . or by objective medical findings." *Id.*
27 (citing *Matney, supra*; *Tonapetyan v. Halter*, 242 F.3d 1144, 1149
28 (9th Cir. 2001)). If the ALJ disregards a treating physician's

29 - FINDINGS AND RECOMMENDATION

1  opinions, "'the ALJ must give specific, legitimate reasons'" for

2  doing so.  *Id.* (quoting *Matney*).

3      The ALJ also determines the credibility of the claimant's

4  testimony regarding his or her symptoms:

> In deciding whether to admit a claimant's
> subjective symptom testimony, the ALJ must
> engage in a two-step analysis.  *Smolen v.
> Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996).
> Under the first step prescribed by *Smolen*,
> . . . the claimant must produce objective
> medical evidence of underlying "impairment,"
> and must show that the impairment, or a combi-
> nation of impairments, "could reasonably be
> expected to produce pain or other symptoms."
> *Id.* at 1281-82. If this . . . test is satis-
> fied, and if the ALJ's credibility analysis of
> the claimant's testimony shows no malingering,
> then the ALJ may reject the claimant's testi-
> mony about severity of symptoms [only] with
> "specific findings stating clear and con-
> vincing reasons for doing so."  *Id.* at 1284.

*Batson*, 359 F.3d at 1196.

### B.  *The ALJ's Decision*

       The ALJ found Johnson has not engaged in substantial gainful

activity since his alleged onset date of February 14, 2007.  He has

severe impairments consisting of "hyperacusis; hypertension;

obesity; depression; and a generalized anxiety disorder," (A.R.

12), but his impairments, singly or in combination, do not meet the

Listing level of severity.  (A.R. 13)  The ALJ found Johnson has

the following residual functional capacity:

> [T]o perform a full range of work at all
> exertional levels but with the following non-
> exertional limitations: claimant is able to
> wear earphones or similar devices in order to
> reduce the noise environment; claimant must
> avoid unprotected heights, dangerous machin-
> ery, or work around vibrations; he is able to
> work in a clean environment with a low level

30 - FINDINGS AND RECOMMENDATION

1          of noise; and has the ability to occasionally
          interact with supervisors and coworkers.
2

3 (A.R. 14)

4     The ALJ did not give controlling weight to Dr. Gizara's
5 opinion that Johnson would have difficulty functioning successfully
6 in a work setting.  He found the doctor's opinion to be "inconsis-
7 tent with her own GAF score of 65 and the totality of the medical
8 evidence as a whole." (A.R. 16)  The ALJ noted Johnson's GAF had
9 improved dramatically from 41 in August 2008, to 65 in February
10 2010.  He also noted that he had "included significant environ-
11 mental limitations in the residual functional capacity cited
12 above." (*Id.*)

13     The ALJ found Johnson's "activities of daily living are
14 inconsistent with an individual whose symptoms are unremitting and
15 wholly unresponsive to treatment." (*Id.*)  He noted Johnson
16 performs his own personal care without difficulty; occasionally
17 feeds his pets; can prepare his own meals, do his laundry, and take
18 out the garbage; drives a car and uses public transportation; shops
19 for groceries and computer parts; maintains a part-time job
20 maintaining websites; and rides a bicycle to perform a daily paper
21 route. (*Id.*)

22     The ALJ found that Johnson's "ability to perform work at all
23 exertional levels has been compromised by nonexertional limita-
24 tions." (A.R. 17)  He relied on the VE's testimony that someone of
25 Johnson's age and with his education, work experience, and residual
26 functional capacity would be able to work in jobs such as
27 industrial cleaner, automobile detailer, and restroom attendant.

28

31 - FINDINGS AND RECOMMENDATION

1  (A.R. 17-18)  The ALJ therefore concluded Johnson is not disabled.
2  (A.R. 18)

3

4                    **IV.  *STANDARD OF REVIEW***

5      The court may set aside a denial of benefits only if the
6  Commissioner's findings are "'not supported by substantial evidence
7  or [are] based on legal error.'"  *Bray v. Comm'r of Soc. Sec.*
8  *Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v.*
9  *Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)); *accord Black*
10 *v. Comm'r of Soc. Sec. Admin.*, slip op., 2011 WL 1930418, at *1
11 (9th Cir. May 20, 2011).  Substantial evidence is '"more than a
12 mere scintilla but less than a preponderance; it is such relevant
13 evidence as a reasonable mind might accept as adequate to support
14 a conclusion.'"  *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035,
15 1039 (9th Cir. 1995)).

16     The court "cannot affirm the Commissioner's decision 'simply
17 by isolating a specific quantum of supporting evidence.'"  *Holohan*
18 *v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*
19 *v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1998)).  Instead, the court
20 must consider the entire record, weighing both the evidence that
21 supports the Commissioner's conclusions, and the evidence that
22 detracts from those conclusions.  *Id.*  However, if the evidence as
23 a whole can support more than one rational interpretation, the
24 ALJ's decision must be upheld; the court may not substitute its
25 judgment for the ALJ's.  *Bray*, 554 F.3d at 1222 (citing *Massachi v.*
26 *Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).
27 / / /
28 / / /

32 - FINDINGS AND RECOMMENDATION

1
## V.   DISCUSSION

2        The Commissioner moves for remand for further proceedings.  In

3 his brief, the Commissioner makes the following concessions:

4                The Commissioner concedes the ALJ erred
                 in his treatment of the opinions of Drs.
5                McConochie and Gizara and in his credibility
                 determination.  As a result of these errors,
6                the ALJ erred in his residual functional
                 capacity finding, and the subsequent steps in
7                the sequential evaluation.  Additionally, the
                 commissioner acknowledges the ALJ included a
8                limitation in the RFC, which is an accommoda-
                 tion - specifically, the wearing of earphones
9                or other devices to reduce noise.  Thus, the
                 jobs identified as suitable for [Johnson]
10               included an accommodation.  At step five, work
                 that exists in the national economy must exist
11               without regard to a reasonable accommodation.

12 Dkt. #20, p. 5.  Despite these concessions, however, the Commis-

13 sioner argues remand is the appropriate remedy.  He asserts "there

14 are unresolved issues," and "the record does not clearly require a

15 finding of disability."  *Id.*

16        The Commissioner argues the court should not apply the

17 "crediting as true" doctrine in this case.  Under the doctrine, the

18 court credits evidence as true and remands for immediate payment of

19 benefits when "'(1) the ALJ has failed to provide legally

20 sufficient reasons for rejecting such evidence, (2) there are no

21 outstanding issues that must be resolved before a determination of

22 disability can be made, and (3) it is clear from the record that

23 the ALJ would be required to find the claimant disabled were such

24 evidence credited.'"  *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th

25 Cir. 2000) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir.

26 1996)).   The "crediting as true" doctrine allows the court a

27 certain measure of flexibility in determining whether to enter an

28 award for immediate payment of benefits upon reversing the

33 - FINDINGS AND RECOMMENDATION

1  Commissioner's decision.  *Connett v. Barnhart*, 340 F.3d 871, 876

2  (9th Cir. 2003) (citations omitted); *accord Costa v. Astrue*, 743 F.

3  Supp. 2d 1196, 1216 (D. Or. 2010).  Here, the Commissioner argues

4  there are outstanding issues that must be resolved before a

5  determination of disability can be made.  The Commissioner asserts

6  the ALJ should be required to determine an RFC without regard for

7  limitations that constitute an accommodation, and "should revisit

8  [Johnson's] allegations and consider whether [his] religion

9  prevented him from taking medication."  *Id.*, pp. 9-10.

10     Johnson responds that the record has already been fully

11  developed, and there are no issues left to resolve.  He argues the

12  Commissioner is, in effect, asking for an unwarranted second bite

13  at the apple.  The court agrees with Johnson.

14     The court finds the ALJ erred in failing to give controlling

15  weight to Dr. Gizara's opinion.  Her opinion that Johnson would

16  only be able to work with significant environmental accommodations

17  is consistent with that of consulting examiner Dr. Perry, who noted

18  Johnson has "significant hearing and communicative limitations,

19  secondary to [his] hyperacusis," and "generally needs to wear

20  headphones to dampen and reduce noises[.]"  (A.R. 242)  Dr. Briggs

21  also agreed with this assessment.

22     Dr. Gizara's opinion that Johnson easily becomes "distracted,

23  overwhelmed, and irritable by even minor sources of noise in the

24  environment," (A.R. 354), is consistent with examining physician

25  Dr. McConochie's opinion that Johnson has moderate limitations in

26  his ability to sustain concentration, attention, and pace, and to

27  engage in appropriate social interactions.  (A.R. 228)

28  / / /

34 - FINDINGS AND RECOMMENDATION

"An ALJ may reject the uncontradicted medical opinion of a treating physician only for 'clear and convincing' reasons supported by substantial evidence in the record." *Pelroy v. Astrue*, slip op., 2010 WL 4259731, at *12 (D. Or. Sept. 28, 2010) (citing *Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001), in turn citing *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998)). Here, where Dr. Gizara's opinion regarding the nature and severity of Johnson's impairment is "well-supported by medically acceptable clinical . . . diagnostic techniques and is not inconsistent with the other substantial evidence" in the Record, it should have been given controlling weight. *See id.*; 20 C.F.R. § 404.1527(d)(2). Even when the record contains evidence, such as Johnson's GAF score of 65, that could support the rejection of Dr. Gizara's opinion, it is appropriate for the court to accept her opinion as true when it is supported by  and consistent with abundant evidence in the Record. *Id.* (citing *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996); *Harman v. Apfel*, 211 F.3d 1172, 1178-79 (9th Cir. 2000)).

Had Dr. Gizara's opinion been given controlling weight, it is clear from the record that Johnson would have been found disabled. The VE testified there are many jobs that would allow someone to wear headphones - but he recognized this would be an accommodation. Even the jobs listed by the VE that offer low noise levels would require some exposure to noise. Moreover, the VE appears to have missed the point, focusing on Johnson's inability to hear noises going on around him in the workplace. Johnson's problem is not his inability to hear; it is, first, that he has constant tinnitus regardless of sounds going on around him, and second, he hears more

35 - FINDINGS AND RECOMMENDATION

1   acutely, to the point of distraction/irritation.  Had the ALJ
2   properly assessed Johnson's residual functional capacity consistent
3   with Dr. Gizara's opinion, none of the jobs identified by the VE
4   would have fit Johnson's RFC.

5       The decision whether to remand for further proceedings, or for
6   immediate payment of benefits, is within the court's discretion.
7   *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000).  Remand for
8   an immediate award of benefits is warranted when either "no useful
9   purpose would be served by further administrative proceedings,
10  . . . or when the record has been fully developed and there is not
11  sufficient evidence to support the ALJ's conclusion." *Rodriguez v.*
12  *Bowen*, 976 F.2d 759, 763 (9th Cir. 1989) (citing *Kornock v. Harris*,
13  648 F.2d 525, 527 (9th Cir. 1985); *Hoffman v. Heckler*, 785 F.2d
14  1423, 1425 (9th Cir. 1986)).  If additional administrative pro-
15  ceedings could remedy defects, then remand is appropriate, "but
16  where remand would only delay the receipt of benefits, judgment for
17  the claimant is appropriate." *Id.* (citing *Bilby v. Schweiker*, 762
18  F.2d 716, 719 (9th Cir. 1985)).  In this case, the record has been
19  developed fully, and remand would only delay Johnson's receipt of
20  benefits.  The ALJ erred in determining that Johnson retains the
21  residual functional capacity to perform any type of substantial
22  gainful activity, absent significant environmental accommodations.

23
24                          *VI.  CONCLUSION*

25      For the reasons discussed above, I recommend the opinions of
26  Drs. McConochie and Gizara be credited as true, Johnson's testimony
27  be found credible, and this case be reversed and remanded for
28  immediate calculation and award of benefits.

36 - FINDINGS AND RECOMMENDATION

1                           ***VII.   SCHEDULING ORDER***

2          These Findings and Recommendations will be referred to a

3   district judge.  Objections, if any, are due by **March 5, 2012**.  If

4   no objections are filed, then the Findings and Recommendations will

5   go under advisement on that date.  If objections are filed, then

6   any response is due by **March 19, 2012.**  By the earlier of the

7   response due date or the date a response is filed, the Findings and

8   Recommendations will go under advisement.

9          IT IS SO ORDERED.

10                           Dated this 17th day of February, 2012.

11

12                           /s/ Dennis J. Hubel

13                           _____

14                           Dennis James Hubel
                             Unites States Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

37 - FINDINGS AND RECOMMENDATION